## THE UNITED STATES, APPELLANTS, *v.* FRANCISCO PICO AND OTHERS.

Where the archives of California show that a petition for land was presented to the justice of the peace and military commandant at New Helvetia in 1846; that a favorable report was made on the 1st May, 1846; that the prefect certified, on the 18th May, 1846, that the land was vacant; that the Governor, on the 11th of June, 1846, made an order for a titulo in form, and the claimant produced from his custody a titulo dated at Los Angeles on the 20th of July, 1846, there is a departure from the regular and usual mode for securing lands under the colonization laws.

The titulo bears date on the 20th of July, and the 7th of July, 1846, is the epoch established by the act of Congress of 1851 and the decisions of this court, at which the power of the Governor of California, under the authority of Mexico, to alienate the public domain, terminated.

The evidence that the claimant occupied the land in 1847 is not satisfactory, or that he made any assertion of claim or title until the presentation of the claim in 1853 to the board of commissioners.

THIS was an appeal from the District Court of the United States for the northern district of California.

The nature of the claim is stated in the opinion of the court.

The case was argued by *Mr. Stanton* for the United States, and by *Mr. Gillet* for the appellee, upon a brief filed by himself, and adopting also a printed argument by *Messrs. Stanly* and *King.*

The points made by *Mr. Stanton* were the following:

1. There was no petition to the Governor soliciting the land agreeably to the regulations of 1828.

*United States* v. *Pico et al.*

2. The marginal decree made by Pico upon the 11th of June, 1846, was not a grant, and does not profess to be a grant.

3. The grant itself, which is dated on the 20th July, 1846, was after the conquest of the country by the American arms, and when the Mexican authorities had been entirely displaced and expelled.

4. There being no record evidence of the grant, there could be no legal title in the grantee.

Upon the third point, *Mr. Stanton* said that the Governor had no power over this land when the grant purports to have been made. It was fifty miles north of Monterey, where his power was destroyed.

> Senate Documents, vol. 1, page 653, of 2d session Twenty-ninth Congress.

On the 9th of July, the flag of the United States was flying at Sonoma, and on the 11th, at every place north of Los Angeles. Suppose Pico had transferred a county to England. There is a grant of two hundred square leagues conferred by the Departmental Assembly on 24th July. There was no more power in the one case than in the other.

*Mr. Gillet* made many points with regard to the title, which there is not room to insert. With respect to the date of it, he contended that it became operative on the 11th of June, when an equitable title was vested in the grantee. His tenth point was as follows:

10. If the paper dated the 20th of July, 1846, at Los Angeles, is held to be the origin of the title, such title is valid, and no way affected by the American forces taking possession of Monterey only thirteen days previous thereto.

Monterey is on the Pacific coast, from one to two hundred miles southerly of San Francisco, and near that distance southwest of the grant in question, and about four hundred miles northerly of Los Angeles. The Costa mountains are between Monterey and Los Calaveras, the latter being to the northeast of the great marshes on the San Joaquin, and near the Sierra Nevada. On the 20th of July, 1846, the American

forces had possession of no portion of California east of the Costa mountains nor south of Monterey. In neither was the authority of the United States exerted or recognised. The people and those in authority had not even heard of the war, and both might and doubtless did think it a re-enactment of the Commodore Jones affair, long years since, at Monterey, which was not approved by our Government. The only war that they knew of was a civil war, which had been carried on a couple of months, under the "bear flag" on one side, and Castro on the other. The California Government was going on as usual, without the least apprehension of a conflict of arms with the United States. All branches of the Government were performing their usual functions, both at the capital, at Los Angeles, and elsewhere, except at Monterey and the bay of San Francisco, where there were vessels of war. There is no evidence that there was a soldier in the field at the time, when a limited number of marines and sailors constituted the whole force, prior to the arrival of General Kearney from New Mexico, long afterwards. There was no order from Sloat or his successors, suspending the functions of the Mexican officials, or notifying them that their acts would not be recognised. They were not apprized that a conquest was contemplated, or a purchase desired or intended; and there is no evidence that the United States contemplated such conquest.

Under such circumstances, the acts of the Mexican authorities, at a distance from the places occupied by the American forces, and at points where they did not attempt to control, must be as valid and effectual as at any anterior period. The former laws remained in force, and these authorized the Governor to make grants. These laws were not annulled, nor others made in their place; the former officials were not removed, nor others substituted. If the old laws were changed, by whom, when, and how, were they changed? Except at the points where the American forces were in actual possession, everything remained as theretofore. Justice was administered by Mexican officials in all parts of the Territory, except in the few places where the Americans actually occupied the place,

and. appointed others to perform that duty. And it has not been shown that one such appointment was made, and notice thereof given, before the 20th of July.

Under these circumstances, both the Mexican officials,-and those doing business with them, had a right to believe that the powers of the one and the rights of the other remained the same. The attempt to change either without giving formal notice, so that both could understand, would be springing upon them a law or rule of action of which they had no knowledge, and no means of acquiring it, and for the reason that the law or rule was made after the occurrence to which it applied.

The political branch of the Government having fixed the date of the acquisition of California, this court cannot alter it, or fix one for itself. That branch fixed the date of the American acquisition on the 2d of February, 1848, and agreed to protect those who had previously acquired rights under Mexico, not excepting those dated after the 7th of July, 1846.

The title of the United States to lands in California dates, not from the commencement of hostilities, but from the date of the treaty by which we acquired them.

[The argument upon this point is omitted for want of room.]

Mr. Justice CAMPBELL delivered the opinion of the court.

The appellee, a Mexican by birth, obtained a decree of confirmation in the District Court for a parcel of land, known as Las Calaveras, containing eight square leagues, and situated in Tuolumne county, in California.

His testimony is an expediente, existing in the archives, in the custody of the surveyor general, from which it appears that the claimant presented, to the justice of the peace and military commandant at New Helvetia, a petition, representing that he desired to obtain a grant for the land described in his diseno; and, to expedite his purpose, he requested a favorable report. One was made, bearing date the 1st of May, 1846. A similar representation was made to the same officer in the district of Yerba Buena, who declined to act, because the place was not within his jurisdiction. The prefect of that

portion of the Department certifies, on the 18th of May, 1846, to the capacity of the claimant, and that the land was vacant. The Governor, on the 11th of June, 1846, made an order for the issue of a titulo in form.

Here the expediente terminates; but the claimant produces from his custody a titulo, bearing date at Los Angeles, the 20th July, 1846.

To strengthen his case, he adduces the testimony of a witness, to the effect that the witness had built a house upon the land in 1847, and had occupied it as tenant from that date; that there were people who inhabited and cultivated the land for the claimant, and that before 1847 the disturbances in the country hindered any improvement or settlement.

This testimony is contradicted by a witness produced on the part of the United States, who testifies with precision, and seems to have had every opportunity of acquiring exact information. He says that he came to reside in the vicinity of the land in 1848, and that there had been no improvement or occupation of it, and that the cattle seen upon the land did not belong to the claimant; that he had never heard of a claim by the petitioner until 1853.

There are grave objections to the allowance of this claim. There is a departure from the regular and usual mode for securing lands under the colonization laws. There is some reason to believe that the Governor was not at Los Angeles at the date of the order; and there is a failure to show, in any satisfactory manner, any assertion of claim or title under it, until the presentation of the claim, in 1853, to the board of commissioners. The claimant is a kinsman of the Governor, and we should expect to find on the part of the Governor the most exact attention to the laws prescribing rules for his guidance under such circumstances. Besides, the titulo bears date of a day when the conquest of Upper California had been completed by the military occupation of Monterey, Sonoma, Bodega, Yerba Buena, and the region of the Sacramento and American rivers, by the forces of the United States.

The commandant in that portion of the Department was making a rapid retreat to Lower California, leaving the coun-

try to the control of the United States. From the capture of Monterey, on the 7th July, 1846, till the surrender of Los Angeles and the organization of a Territorial Government by Commodore Stockton, under the United States, there was scarcely six weeks. The Californian Government, for all practical purposes, was subverted by the capture of Monterey and the country north of it.

In the act of Congress of 1851, and the decisions of this court, that day is referred to as the epoch at which the power of the Governor of California, under the authority of Mexico, to alienate the public domain, terminated. Previously to that date, the claimant did not acquire a title to the land, nor has he acquired an equitable claim to it by any act done upon the land in the fulfilment of the colonization policy of the State.

Upon the whole case, our opinion is, that the appellee has not sustained the validity of his claim, and that the decree in his favor must be reversed, and his petition dismissed.